IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ENERGY FISHING & RENTAL | § | Chapter 11 |
| SERVICES, INC., | § | Case No. 20-20299 |
| | § | |
| Debtor. | § | |

**DECLARATION OF ARTHUR POTTER
IN SUPPORT OF FIRST DAY MATTERS**

I, Arthur Potter, do hereby declare as follows:

1.  My name is Arthur Potter. I am over the age of eighteen years, I have never been convicted of a felony or crime of moral turpitude, and I am otherwise qualified to make this declaration. The factual matters set forth herein are within my personal knowledge and are true and correct.

2.  I am the Chairman of Energy Fishing & Rental Services, Inc. (the "Debtor"). The Debtor was established and incorporated in January 2005. Its primary business involves providing oilfield fishing services. "Fishing" refers to efforts to recover unwanted material caught or left in an oil or gas wellbore. No fishing job is ordinary, and there is rarely an off-the-shelf solution. Getting a project back on track through fishing requires experts with proven skill, experience, and the ability to innovate. More than any other kind of drilling and completing operation, fishing is an art, and it requires critical thinking and skillful use of an expert's tools and experience. The Debtor's officers have a combined total of 105 years of direct experience in fishing and downhole interventions.

3.  In addition to fishing services, the Debtor provides a suite of related product and service lines. These include plugging and abandonment services, casing jacks, pumps and power

swivels, thru-tubing tools, whipstocks and section mills, and a variety of rental tools. Simply put, the Debtor is in the oilfield services business.

4. Unfortunately, since the beginning of 2020, the oil and gas industry—and particularly the oilfield services industry—has faced continuous new challenges. In March 2020, Russia and Saudi Arabia engaged in an economic conflict over the price of oil and gas. This led to a dramatic fall in the price of oil. At the same time, the ongoing COVID-19 pandemic began to intensify, leading to shut-downs around the world. These combined forces wreaked havoc on the oil and gas industry and the Debtor's business. Accordingly, the Debtor filed this Bankruptcy Case to reorganize its financial affairs and save its going concern value.

5. I am making this declaration in support of various "first-day" matters that I understand will be set for hearing at the beginning of the Debtor's bankruptcy case, including (A) a motion to pay prepetition wages; (B) a motion to pay prepetition sales taxes; (C) a motion to pay prepetition critical vendors; (D) a motion for authority to use cash collateral; and (E) a motion to provide adequate assurance to utility providers (collectively, the "First Day Motions"). I am also making this declaration in support of emergency consideration of the First Day Motions.

A. **MOTION TO PAY PREPETITION WAGES**

6. The Debtor's salaried employees were paid current before the Petition Date and are not owed any prepetition amounts. The Debtor's independent contractors, however, are owed relatively small amounts of money based on prepetition work performed:

| Contractor | Service Provided | Amount |
|---|---|---|
| Callina Anderson | Administrative Support | $2,462.50 |
| Allen Hebert | Safety and Contracts | $4,837.00 |
| Thomas Crossland | Sales | $3,183.00 |
| Gary Wood | Account Manager | $4,000.00 |
| | **TOTAL** | **$14,482.50** |

7. Similarly, the Debtor owes certain employees or contractors reimbursements for expenses such employees or contractors incurred on the Debtor's behalf:

| Contractor | Amount |
|---|---|
| Bejarano, Ervey | $ 573.00 |
| Martinez, Hector H Jr | $ 452.00 |
| Ramirez, Hyram V. | $ 1,487.00 |
| Vice, Kennie James | $ 744.00 |
| TOTAL | $ 3,256.00 |

8. It is essential that the Debtor immediately establish the standard of treatment for fulfilling its obligations to its Employees. Any delay in paying these obligations will adversely affect the Debtor's relationship with the employees and could irreparably impair morale. At this critical early stage, the Debtor cannot risk the substantial disruption to its business operations that will result if payment is not permitted. Moreover, the Debtor constitutes a relatively small business, and it relies heavily on the particularized skills of its employees. The risk of losing such valued and qualified persons would cripple any reorganization effort.

9. Finally, the Debtor also owes $5,224.00 to Dearborn Life on account of employee benefits, including vision, dental, long term disability, and similar insurance programs. It is essential for the Debtor to continue providing benefits to its employees in order to maintain morale, particularly given the ongoing pandemic. It is therefore critical that the Debtor stays current with Dearborn Life. Moving to an alternative benefits provider would be impracticable and costly. It makes far more sense from an economic perspective simply to pay the small amount due to Dearborn.

B.     <u>MOTION TO PAY PREPETITION SALES TAXES</u>

10.    As part of its day-to-day business operations, the Debtor collects sales taxes from its customers. For the month of August 2020, the Debtor owes the following amounts in sales taxes to the following State governments: (i) Texas - $18,966.16; and (ii) Pennsylvania - $16.75. The Debtor expects that it will owe similar amounts for the period of time between September 1, 2020 and the Petition Date. The Debtor therefore seeks authority to pay all State sales tax debts incurred before the Petition Date (collectively, the "<u>Sales Taxes</u>"). Generally speaking, such funds are held in trust by the Debtor on behalf of the State government to which they are owed, and the Debtor will incur significant penalties and interest if it does not pay these amounts timely.

C.     <u>MOTION TO PAY PREPETITION CRITICAL VENDORS</u>

11.    By this motion, the Debtor requests authority to pay the following critical vendors (the "<u>Vendors</u>"):

| Vendor | Services Provided | Amount |
|---|---|---:|
| American Express | Credit Card | $8,644.00 |
| DISA | Drug Screening | $171.00 |
| Sun Trust Bank | Credit Card | $5,773.00 |
| Robert Whitley | Contract Fishing Tool Supervisor | $72,481.05 |
| Billy Roberts Downhole Recovery (Billy T Roberts) | Contract Fishing Tool Supervisor | $28,043.46 |
| Primo Oilfield Services LLC (Allen Lee) | Contract Fishing Tool Supervisor | $597.77 |
| Gary Slough | Contract Fishing Tool Supervisor | $2,607.33 |
| J.D. Dickinson | Contract Fishing Tool Supervisor | $580.16 |
| Robert Wilson | Contract Fishing Tool Supervisor | $20,742.15 |
| T5 Enterprises Inc. (Steve Toddy) | Contract Fishing Tool Supervisor | $15,915.34 |
| | **TOTAL** | **$155,555.26** |

12. It is critical for the Debtor to continue its business relationship with each of the Vendors, uninterrupted to the greatest extent possible. Continued and uninterrupted use of the credit cards is essential, for example, because the Debtor, in the ordinary course of its business, must sometimes make purchases on the fly unique to a particular job. Without the availability of the credit offered by American Express and Sun Trust Bank, the Debtor's business could suffer substantially but needlessly. It is also critical that the Debtor maintains its drug screening relationship with DISA. The Debtor's industry is dangerous enough even when every participant is of sound mind and body. The Debtor therefore prides itself in maintaining a drug-free and inherently safer workplace for its employees than it could provide without drug screening. Finally, and perhaps most critically, the Debtor must pay it third-party, contract fishing tool supervisors. If these Vendors were to stop work, the jobs to which they have been assigned would not be completed. If that happened, the customers would not pay the Debtor. This would create an existential crisis where work in progress would not be completed, accounts receivable would not be paid, and the Debtor's business would come to a grinding halt.

13. Even if the Vendors are not sole-source suppliers because others in the market are capable of replacing them, they are for all intents and purposes sole-source suppliers because the Debtor cannot replace them quickly and not without incurring new expenses that likely would exceed the relatively small amounts owed to each of the Vendors. The Debtor does not have executory contracts with any of the Vendors pursuant to which it could compel postpetition service. Therefore, the Debtor faces the prospect that the Vendors will simply refuse to sell any further goods or services to the Debtor without immediate payment of the amounts due.

14. At the same time, the Debtor seeks only *authority* to pay these amounts in the Debtor's discretion, as opposed to being ordered to pay these amounts. The Debtor intends to

negotiate with the Vendors to attempt to avoid having to pay their prepetition claims, or to obtain favorable postpetition credit terms in exchange for these payments. The Debtor will pay these claims only if necessary to avoid immediate and irreparable harm, and only if the Vendor will ensure that it will continue to do business with the Debtor on reasonable terms (in other words, that the Vendor will not simply use the process to extract payment and then cut the Debtor off from postpetition sales or demand unreasonable credit terms). Moreover, all payments will remain subject to disgorgement if so ordered by the Court, due to administrative insolvency or if the Vendor refuses to provide goods or services to the Debtor postpetition. Thus, the Court will retain a measure of control to guard against inequitable behavior.

15. None of the vendors the subject of this Motion are insiders or are affiliated with the Debtor. All are third-parties engaged in arm's length transactions with the Debtor.

D. <u>MOTION TO USE CASH COLLATERAL</u>

16. As of the Petition Date, the Debtor was party to each of: (a) a Loan Agreement dated as of November 30, 2011 (such agreement, along with its thirteen subsequent amendments and existing immediately prior to the Petition Date, the "<u>Prepetition Loan Agreement</u>") with EFRS ST, LLC, as successor-in-interest to Truist Bank, as successor-by-merger to SunTrust Bank, as Lender, pursuant to which Lender agreed to provide term loans and a revolving line of credit as set forth therein; (b) the Amended and Restated Term Note A, dated March 31, 2016, with the Lender (the "<u>Term A Note</u>"), (c) the Term Note B, dated March 31, 2016, with the Lender (the "<u>Term B Note</u>"), (d) the Revolving Credit Note, dated November 30, 2011, with the Lender (the "<u>Revolving Credit Note</u>"), (e) the Security Agreement, dated November 30, 2011, with the Lender (the "<u>Security Agreement</u>"), (f) the UCC Financial Statement no. 11-0034670668, filed with the Texas Secretary of State, as continued by UCC financing statement amendment bearing file

number 001600276260 and assigned by UCC financing statement amendment bearing file number 20-00469981 (collectively, the "Financing Statements"), and (g) any and all other documents, agreements, amendments or instruments executed in connection with the Prepetition Loan Agreement (such other documents, agreements, amendments or instruments collectively with the Prepetition Loan Agreement, the Term A Note, the Term B Note, the Revolving Credit Note, the Security Agreement and the Financing Statements, the "Prepetition Loan Documents").

17. Immediately preceding the Petition Date, the Debtor is liable to Lender in the amount of at least $15,388,690.27 (the "Minimum Prepetition Indebtedness"), all of which is due and owing under the Prepetition Loan Agreement and related Prepetition Loan Documents.

18. On or about September 2, 2020, the Debtor, as borrower, was party to the certain Loan Sale Agreement, of the same date, between Truist Bank, as successor-by-merger to SunTrust Bank and Energy Fishing Investors, LLC, each as "Assignors", EFRS ST, LLC, as "Assignee,"[1] the Debtor, as "Borrower," and Energy Fishing Holdings, Inc., as "Guarantor," pursuant to which (a) Assignors sold and assigned to Assignee and Assignee purchased and assumed from Assignors the Assignors' interest in and to such Assignors' rights and obligations under the Prepetition Loan Documents including without limitation the Minimum Prepetition Indebtedness, and (b) Assignee became a party to the Prepetition Loan Documents as Lender, received the rights of Lender thereunder among its other terms (herein, the "Loan Sale Agreement").

19. Under the Prepetition Loan Documents, the Lender holds a perfected, first priority lien on substantially all of the Debtor's assets to secure repayment of the Minimum Prepetition Indebtedness and any other amounts outstanding under the Prepetition Loan Documents. Among

---

[1] As a result of this assignment, EFRS ST, LLC shall be referred to hereafter as the "Lender."

other things, the Lender holds a perfected, first-priority lien on all the Debtor's cash and cash equivalents.

20. The Debtor has an immediate need for the use of "Cash Collateral" (as defined in 11 U.S.C. § 363(a). Accordingly, the Debtor and the Lender have negotiated an *Agreed Interim Order Authorizing Use of Cash Collateral* (the "Interim Order"), attached to the cash collateral motion as Exhibit "A", pursuant to which the Lender will permit the Debtor to use Cash Collateral in accordance with the budget (the "Budget"), attached to the motion as Exhibit "B", in exchange for adequate protection, as detailed in the motion.

E. **UTILITY ADEQUATE ASSURANCE**

21. The Debtor receives utility service from a number of providers, which can be summarized as follows:

| Vendor | Service | Location | Amount (12 Mo.) | Monthly Avg. | Proposed Adequate Assurance |
|---|---|---|---|---|---|
| ATMOS ENERGY | Electric | Odessa | $1,395.00 | $116.25 | $58.13 |
| CITY OF ALICE | Water | Alice | $2,884.00 | $240.33 | $120.17 |
| CITY OF HOUSTON | Water | Houston - Shop | $3,844.00 | $320.33 | $160.17 |
| CITY OF ODESSA | Water | Odessa | $2,539.00 | $211.58 | $105.79 |
| CITY OF VICTORIA | Water | Victoria | $511.00 | $42.58 | $21.29 |
| COLUMBIA GAS | Gas | Washington, PA | $3,661.00 | $305.08 | $152.54 |
| CONSOLIDATED WATERWORKS DIST. NO.1 | Water | Houma | $1,473.00 | $122.75 | $61.38 |
| CONSTELLATION NEW ENERGY, INC. | Electric | Alice | $12,732.00 | $1,061.00 | $530.50 |

| Vendor | Service | Location | Amount (12 Mo.) | Monthly Avg. | Proposed Adequate Assurance |
|---|---|---|---|---|---|
| CONSTELLATION NEW ENERGY, INC. | Electric | Houston - Shop | $13,647.00 | $1,137.25 | $568.63 |
| CONSTELLATION NEW ENERGY, INC. | Electric | Victoria | $5,126.00 | $427.17 | $213.58 |
| CONSTELLATION NEW ENERGY, INC. | Electric | Odessa | $13,599.00 | $1,133.25 | $566.63 |
| ENTERGY | Electric | Houma | $9,246.00 | $770.50 | $385.25 |
| LIBERTY POWER | Electric | Dilley | $6,733.00 | $561.08 | $280.54 |
| REPUBLIC SERVICES #853 | Trash Pickup | Houston - Shop | $5,405.00 | $450.42 | $225.21 |
| REPUBLIC SERVICES #859 | Trash Pickup | Dilley | $2,861.00 | $238.42 | $119.21 |
| TOMAHAWK DISPOSAL | Trash Pickup | Hobbs, NM | $1,272.00 | $106.00 | $53.00 |
| WASTE MANAGEMENT - 13648 | Trash Pickup | Washington, PA | $4,365.00 | $363.75 | $181.88 |
| WASTE MANAGEMENT - 660345 | Trash Pickup | Victoria | $2,261.00 | $188.42 | $94.21 |
| WEST PENN POWER | Electric | Washington, PA | $3,396.00 | $283.00 | $141.50 |
| XCEL ENERGY | Electric | Hobbs, NM | $3,180.00 | $265.00 | $132.50 |
| ZIA NATURAL GAS COMPANY | Gas | Hobbs, NM | $947.00 | $78.92 | $39.46 |

22.     The Debtor proposes to provide adequate assurance of future payments to these utility providers by supplying each of them with a deposit in the amount of the proposed adequate assurance identified in the table above.  Uninterrupted utility service is critical to the Debtor's continued operations.

F.     **EMERGENCY CONSIDERATION**

23.    As discussed above, the Debtor's financial situation has been jeopardized due to market conditions beyond the Debtor's control, such as a price war between two foreign powers and the ongoing COVID-19 pandemic.  The Debtor therefore filed this bankruptcy case to reorganize its financial affairs and obtain a fresh start.  But the Debtor's situation is precarious.  Any further shocks to its system could be detrimental.  I therefore believe that emergency consideration of the First Day Motions is necessary to avoid immediate and irreparable harm.  The Debtor simply cannot continue to survive without the support of its employees, contractors, and critical vendors.  Likewise, the Debtor cannot afford to incur substantial fees and interest penalties for failing to pay prepetition sales tax on time.  And none of this would be possible if the Debtor does not rapidly obtain authority to use cash collateral.  In other words, the Debtor's prospects for reorganization depend on emergency consideration of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September ___23, 2020.

_____
[NAME] Arthur L. Potter